

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 7, 2016**

United States Bankruptcy Judge

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | **CASE NO.  15-33757-BJH** |
| | § | **(Chapter 11)** |
| **WILLIAM R. CANADA, JR.,** | § | |
| | § | |
| **DEBTOR.** | § | |
| | § | **Related to ECF Nos. 40, 82** |
| | § | |

## MEMORANDUM OPINION

Before the Court are Debtor's Objection to Claim of United States Department of Thr [sic] Treasury/Internal Revenue Service [ECF No. 40] (the "**Original Claim Objection**") and Debtor's Supplemental Objections to Claim of United States Department of The Treasury/Internal Revenue Service [ECF No. 82] (the "**Supplemental Claim Objection**" and together with the Original Claim Objection, the "**Claim Objections**") filed by the debtor, William Ralph Canada, Jr. ("**Canada**" or the "**Debtor**").  The Claim Objections relate to a proof

**MEMORANDUM OPINION**                                                                                           **Page 1**

of claim (the "**Original Proof of Claim**")[1] and an amended proof of claim (the "**Amended Proof of Claim**")[2] filed by the United States Department of the Treasury/Internal Revenue Service (the "**IRS**").    Pursuant to the Scheduling and Case Management Order Regarding Debtor's Objection to Claim of the United States Department of The Treasury/Internal Revenue Service (the "**Scheduling Order**") entered on February 1, 2016 [ECF No. 67], an evidentiary hearing on the Claim Objections commenced on May 12, 2016 and concluded on May 13, 2016.[3] At the Court's direction, the IRS filed a post-trial brief on May 19, 2016,[4] and Canada filed a reply brief on May 23, 2016.[5]   The Claim Objections are now ripe for ruling.

After carefully considering the arguments of the parties (as advanced orally and in writing both pre and post-trial), the evidence admitted at trial, and its own research of the legal issues raised, this Memorandum Opinion contains the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.[6]

## I.    JURISDICTION, AUTHORITY, AND VENUE

The district court of the Northern District of Texas has subject matter jurisdiction over the Debtor's bankruptcy case pursuant to 28 U.S.C. § 1334.   This Court has the authority to determine the allowance or disallowance of the Amended Proof of Claim, which seeks tax penalties under 26 U.S.C. § 6707, pursuant to 28 U.S.C. § 157(a), (b)(1), (b)(2)(B), 11 U.S.C. §

---

[1] Case No. 15-33757-BJH-11, Claim No. 4-1.

[2] Case No. 15-33757-BJH-11, Claim No. 4-2.

[3] Scheduling Order [ECF No. 67].

[4] Case No. 15-33757-BJH-11, IRS Post-Trial Brief [ECF No. 108].

[5] Case No. 15-33757-BJH-11, Canada's Post-Trial Brief [ECF No. 111].

[6] To the extent that a finding of fact is more properly construed as a conclusion of law, or vice versa, they should be so construed.

**MEMORANDUM OPINION**                                                                                    **Page 2**

505(a), and the Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc adopted in the Northern District of Texas on August 3, 1984. Venue is proper in this district pursuant to 28 U.S.C. § 1408.

## II. FACTUAL AND PROCEDURAL HISTORY

The issue raised by the Claim Objections is whether Canada is liable for the $40,346,167.87 in penalties that the IRS asserts in the Amended Proof of Claim.[7] According to the IRS, Canada is liable for these penalties because under 26 U.S.C. § 6111—as effective during 1998-2002, the time period at issue here (the "**Relevant Time Period**")—Canada was a "tax shelter organizer" who was required to register certain "tax shelters" that he helped to market and sell (the "**Heritage Transactions**") while he was working at the Heritage Organization, LLC ("**Heritage**") during the Relevant Time Period.[8] Failure to register a "tax shelter" under 26 U.S.C. § 6111 leads to penalties under 26 U.S.C. § 6707 which are equal to "1 percent of the aggregate amount invested in such tax shelter."[9]

Canada argues that he is not liable for penalties under 26 U.S.C. § 6707 on various grounds, but for the purposes of this Memorandum Opinion two of those grounds are controlling. First, Canada argues that the Heritage Transactions were not "tax shelters" as that term is defined in 26 U.S.C. § 6111(c) because tax shelters under § 6111(c) must be an "investment" and the

---

[7] Case No. 15-33757-BJH-11, Claim No. 4-2.

[8] 26 U.S.C. § 6111(a) (1998) (amended 2004) ("Any tax shelter organizer shall register the tax shelter with the Secretary (in such form and in such manner as the Secretary may prescribe) not later than the day on which the first offering for sale of interests in such tax shelter occurs.").

[9] 26 U.S.C. § 6707 (1998) (amended 2004).

Heritage Transactions are an idea or strategy rather than an investment.[10]  Second, Canada argues that even if 26 U.S.C. § 6111 required him to register the Heritage Transactions as a tax shelter, he should not be liable for penalties under 26 U.S.C. § 6707 because he has established reasonable cause for his failure to register them.[11]  The Court will provide a factual and procedural history of this case, and will then proceed to evaluate these two arguments, as they are dispositive of the issues here.[12]

After graduating from Harvard law school in 1979 and prior to his employment at Heritage, Canada worked at a variety of law firms primarily as a commercial litigator.[13]  Canada testified that he had "very little" tax experience prior to coming to work at Heritage in 1995.[14] Canada was initially exposed to Heritage through its main principal, Gary Kornman (**"Kornman"**), for whom Canada periodically handled what were primarily employment litigation matters.[15]  In 1994, unhappy practicing law, Canada concluded that he should "try

---

[10] 26 U.S.C. § 6111(c)(1) (1998) (amended 2004) ("The term 'tax shelter' means any *investment*..." (emphasis added)).

[11] 26 U.S.C. § 6707(a)(1) (1998) (amended 2004) ("No penalty shall be imposed…with respect to any failure which is due to reasonable cause.").

[12] Because of the dispositive nature of these two arguments, the Court declines to reach the other objections that the Debtor raises in the Claim Objections. These objections include: statute of limitations; laches; claim and issue preclusion, res judicata, collateral estoppel, law of the case, waiver, election of remedies, and judicial admission/estoppel; that the Heritage Transactions were not "listed investments" or "listed transactions;" that 26 C.F.R. § 301.6111-1T is invalid for failure to comply with the Administrative Procedures Act; that the IRS has acted in an arbitrary and capricious manner in seeking to hold Canada liable for penalties; and that holding Canada liable for penalties would violate the United States Constitution. *See* Original Claim Objection at ¶¶ a-c, f, h-j, l-o; Supplemental Claim Objection.

[13] Hr'g Trans. May 13, 2016 at 11:19:10 – 11:21:30 (Canada).

[14] Hr'g Trans. May 13, 2016 at 11:20:00 – 11:20:35 (Canada) (Canada joined the Heritage Organization, LLC in 1995); Hr'g Trans. May 13, 2016 at 11:21:20 – 11:23:50 (Canada) (Specifically, Canada testified that he had "very little [experience] on pure tax matters. I did over the years some probate litigation which occasionally would involve tax-related issues like valuation of real estate partnerships and things of that nature, but I never handled what you would actually consider a tax case outside of probate court.").

[15] Hr'g Trans. May 13, 2016 at 11:23:25 – 11:24:45 (Canada).

**MEMORANDUM OPINION**                                              **Page 4**

something different because [he] wasn't enjoying what he was doing day-to-day."[16] Around this time, Kornman offered Canada a job at Heritage.[17] At first, Canada was hired by Heritage as a "contractor," which in Heritage's parlance was someone who would initially meet with prospective clients in order to interest them in Heritage's services, including the Heritage Transactions.[18] By 1998, Canada was a key player at Heritage who was heavily involved in the marketing and sale of the Heritage Transactions to clients.[19] Beyond his responsibility for marketing and selling the Heritage Transactions, at some point Canada became Heritage's President and/or Chief Operating Officer, although he contends that Kornman was always the person who was truly in control of Heritage.[20] Regardless of how much authority Canada had

---

[16] Hr'g Trans. May 13, 2016 at 11:25:45 – 11:27:00 (Canada).

[17] Presumably part of what attracted Canada to Heritage was that he would have the opportunity to do work that was not the practice of law. Hr'g Trans. May 13, 2016 at 11:26:30 – 11:27:15 (Canada) ("That was part of the arrangement, explicitly. I was not going to be in house counsel or be a lawyer for the company.").

[18] Hr'g Trans. May 12, 2016 at 9:40:10 – 9:42:15 (Canada) ("What I was hired for as I understood it was to learn the business of Heritage and ultimately be able to make presentations to clients. I think the term that Mr. Kornman used at the time he hired me was to be a contractor in training…The contractors were what I would consider the pure salesman who went out and did the opening meetings to establish credentials and interest on behalf of the, of a prospective client, and then the principals—and when I joined the company it was only Mr. Kornman—would then go in and work with the client in getting them to sign a contract and if they did making presentations on some strategy or other.").

[19] Hr'g Trans. May 12, 2016 at 10:20:00 – 10:21:30 (Canada) (In a given month, Canada would have face-to-face contact with an average of three prospective clients a week.); Hr'g Trans. May 12, 2016 at 10:25:00 – 10:26:00 (Canada) ("For different periods of time I was the President from whenever that started through the day I was dismissed…I was Chief Operating Officer until sometime early in 2000 when I was replaced."); Hr'g Trans. May 12, 2016 at 10:25:50 – 10:26:10 (Canada) (Agrees that it is "probably so" that he has previously testified that he was the second-most important person at the company.); Hr'g Trans. May 12, 2016 at 10:36:30 – 10:37:30 (Canada) (On a day-to-day basis, if there were ongoing client meetings, he was involved in the preparation of PowerPoints and presentations. He would "sit in analytical and, and, and talk to those guys and see what they were doing and what they were preparing, and particularly as it related to my clients."); Hr'g Trans. May 12, 2016 at 10:37:25 – 10:38:30 (Canada) (One of Canada's functions was to get certain clients' attorneys out of the way.); Hr'g Trans. May 12, 2016 at 10:46:45 – 10:47:40 (Canada) (Canada identifies himself as a Heritage principal—as opposed to merely a contractor—regarding one of the Heritage Transactions); Hr'g Trans. May 12, 2016 at 10:50:30 – 10:53:40 (Canada) (Canada describing a particular situation where he was instrumental in getting a Heritage client to sign a contract by dealing with his regular attorney and by drafting certain amendments to the normal Heritage contract).

[20] Hr'g Trans. May 13, 2016 at 11:40:45 – 11:42:00 (Canada) (Canada testifying that he had no authority as the titular President of Heritage. "When he asked me to be Chief Operating Officer I had limited functions there, which

---

**MEMORANDUM OPINION**                                                                **Page 5**

over the operations of Heritage itself, one thing is clear—during the Relevant Time Period, Canada was heavily involved in the organization, implementation, and marketing of the Heritage Transactions.[21]

The Heritage Transactions were first marketed in 1998, and they were designed to ameliorate capital gains taxes for Heritage's clients.[22] The Heritage Transactions were initially conceived of by an attorney named Edward Ahrens ("**Ahrens**") of Ahrens and DeAngeli, who brought the concept to Heritage's attention and who also did legal work for Heritage's clients related to the Heritage Transactions after the concept was more fully developed.[23] The particular Heritage Transactions for which the IRS seeks to impose penalties on Canada occurred between 1998 and 2001.[24] Canada described the Heritage Transactions in his trial testimony as follows:

> at its simplest, I guess, the client would form an entity, an LLC, or some other type of pass through entity like an S-Corporation, would open a brokerage

were, I mean, I didn't go to business school, but I do understand the difference between making, making policy, and carrying out policy, and I was definitely in the carrying out policy department, which was do only what [Kornman] instructed you to do."). In addition, Canada testified that he had no responsibility, or even authority, to engage in reporting or registration for Heritage under the terms of his employment agreement. Hr'g Trans. May 13, 2016 at 11:44:45 − 11:45:21 (Canada); Debtor's Ex. 7 ¶ 7.1 ("I agree, represent and warrant that if at any time during my employment or thereafter, I become aware of any fact, activity, business practice, circumstance, information or other matter relating to the Company, an employee (past, present or future) of the Company, a Client or the business of the Company (a) which I am under any legal obligation or moral or ethical compulsion to disclose to any regulatory agency, law enforcement agency or other Third Party…any and all of the above will be reported by me to the Manager of the Company, by its Chairman of the Board, in writing and I agree, represent and warrant that I will not in any other manner use, disclose, copy or assist any other Person or entity in the use, disclosure or copying of the information subject to this Article 7.1…Any failure to so report to the Manager of the Company, by its Chairman of the Board, in writing shall be deemed to be complicity by me in such fact, activity, business practice, circumstance, information or other matter and I shall be held fully responsible therefor and liable for all damage resulting therefrom…").

[21] *See* p. 5 n.19, *supra*.

[22] Hr'g Trans. May 12, 2016 at 9:42:00 − 9:43:30 (Canada) ("We continued to market estate planning strategies throughout, but there was a need out there for capital gains strategies, and Ahrens and DeAngeli, a law firm based in the Pacific Northwest brought a strategy to Heritage that we began marketing.").

[23] *See* pp. 31-34, *infra*.

[24] *See* Debtor's Ex. 12 at 8. Column 3 on page 8 of Debtor's Ex. 12—labeled "Date of Heritage Contract"—shows contract dates for the Heritage Transactions at issue here, which range from 1998 to 2001. *Id.*

**MEMORANDUM OPINION** **Page 6**

account with a major brokerage firm, would sell Treasury securities short, would then reinvest those into what are called reverse repurchase agreements, that brokerage account would then be contributed to a partnership, and at that point in time the lawyers opined that the client created basis in the partnership equal to the amount of the proceeds of the Treasury short.[25]

The Treasury securities that Canada described were not purchased outright by Heritage clients, but were instead borrowed pursuant to an obligation to return or replace those Treasury securities in the future. When a Heritage client's brokerage account was contributed to a partnership in the scenario Canada described, as an economic matter the obligation to replace the Treasury securities would also be contributed to the partnership.[26] The key to the "tax magic" of the Heritage Transactions was in how this obligation to replace the Treasury securities was treated as a tax matter. During the Relevant Time Period, certain lawyers were willing to opine that under the Internal Revenue Code, Heritage clients contributing their brokerage accounts to the partnerships involved in the Heritage Transactions could, as a tax matter, disregard their obligation to eventually replace the Treasury securities, because this obligation was a contingent liability.[27] Disregarding this obligation created a variety of opportunities to manufacture capital

---

[25] Hr'g Trans. May 12, 2016 at 9:44:30 – 9:46:00 (Canada). When Heritage clients opened a brokerage account as described by Canada, they did not need to deposit into the account an amount of money equal to the value of the Treasury securities that they wished to sell short. Instead, they "would invest enough money…to put up the margin amount to do a short transaction." Hr'g Trans. May 12, 2016 at 9:47:00 – 9:48:00 (Canada). This margin amount or margin deposit was small in comparison to the value of the Treasury securities that would then be placed into a Heritage client's brokerage account, and so by placing a relatively small amount of money down Heritage clients were able to gain access to a large amount of Treasury securities, which could in turn generate a large amount of artificial tax benefits. *See, e.g.,* Debtor's Ex. 12 at 8 (by comparing column 6 ("Margin Deposit") with column 7 ("Treasury Securities"), it can be seen that, overall, Heritage clients were able to receive $2,639,649,027 in Treasury securities by making margin deposits totaling only $81,341,427).

[26] Hr'g Trans. May 12, 2016 at 9:46:00 – 9:49:10 (Canada) ("The brokerage account would then be contributed down to the partnership along with the obligation to return or to deliver Treasury securities and someday close out the short sale.").

[27] Hr'g Trans. May 12, 2016 at 9:49:00 – 9:56:15 (Canada).

**MEMORANDUM OPINION** **Page 7**

losses or to artificially offset capital gains.[28]

When Canada marketed the Heritage Transactions, he was not attempting to sell shares of a particular partnership entity or the services of a particular brokerage company or law firm. Instead, the product that Canada sold was an idea—*i.e.*, a strategy for producing incredible tax savings that Heritage would reveal to its clients for a (very high) price. This is what the evidence shows that the Heritage Transactions were—an idea or a strategy. For example, Heritage's contracts with its clients provided that "[Heritage], after receiving the necessary data and objectives regarding the financial situation and potential tax liabilities of the Principals and after meeting with the Principals to discuss their objectives, may communicate to the Principals one or more Strategies which, singularly or in combination, may produce the following results (herein referred to as the "Results")…"[29] These "Results" mostly involved the reduction of tax liabilities.[30] "Strategies" was a defined term in Heritage's contracts, and the contracts stated that the term "Strategies"

> shall be broadly construed and shall mean the securities, contracts, Persons identified, facts, data, knowledge, documentation, opinions, combinations of concepts, ideas, techniques, methods, transactions, combinations, sequences of events, timing, financial models, diagrams, illustrations, and procedures divulged, described, communicated, detailed, arranged or identified by [Heritage] and all variations, modifications, sequences, rearrangements and recombinations thereof.[31]

---

[28] Hr'g Trans. May 12, 2016 at 9:49:00 – 9:51:30 (Canada).

[29] IRS Ex. M at A 0001. There are multiple Heritage contracts in the record. All of the contract provisions that the Court discusses are the same or substantially similar in all of these Heritage contracts unless otherwise noted. *See* IRS Exs. H-U.

[30] *Id.* Certain Heritage contracts proposed "Results" that went beyond reducing taxes. *See* IRS Ex. J at JJ 0001, IRS Ex. K at AB 0001, IRS Ex. N at CE 0024, IRS Ex. O at FF 0001, IRS Ex. S at CB 0069, IRS Ex. T at CB 0001.

[31] IRS Ex. M at A 0005. Another version of the definition of "Strategies" used by Heritage was "the contracts, Persons identified, facts, data, knowledge, documentation, opinions, concepts, ideas, techniques, methods, transactions, combinations, sequences of events, timing, financial models, diagrams, illustrations, and procedures

**MEMORANDUM OPINION** **Page 8**

The Heritage contracts acknowledge that although "the Strategies are not necessarily composed of information which is proprietary, trade secrets or exclusively known to [Heritage]" that nevertheless "the usefulness and value of the Strategies may be attributable to the timing, sequencing and combinations of the various non-proprietary components of the Strategies and/or to the fact that the Strategies may not be known to the Principals even though they may be known to others."[32]

That the value of the Heritage Transactions consisted of their status as a clever and little known idea or strategy is made clear by the dire monetary consequences that flowed from Heritage clients disclosing the Heritage Transactions to third parties:

> In the event that any of the Principals [the Heritage clients] Reveal one or more of the Strategies to any Person other than the Authorized Advisors or Authorized Persons, the Principals agree to pay to [Heritage] the following fees: (i) Two Million Dollars ($2,000,000) for each Person to whom the Strategies are Revealed, directly or indirectly, by the Principals themselves or through any Persons, which fees shall be due and payable, with respect to each such Person, ten (10) days after the Strategies are Revealed to such Person; and (ii) if any of the Strategies are Implemented by any Person to whom the Strategies are Revealed, directly or indirectly, by the Principals themselves or through any Persons, six percent (6%) of the Value of all Property used to Implement any of the Strategies…The fees under this Article VII shall apply to all Property used to Implement a Strategy at any time during the one hundred twenty (120) months following the date of disclosure of any Strategy.[33]

As Canada testified, "[w]e were selling…an idea, and I think that's what the contract said."[34]

Indeed, that is what the Heritage contracts said. The Heritage Transactions—rather than offering

---

divulged, described, communicated, detailed, arranged or identified by [Heritage] and all variations, modifications, sequences, rearrangements and recombinations thereof." IRS Ex. M at A 0005.

[32] IRS Ex. M at A 0002.

[33] *Id.* at A 0002-0003.

[34] Hr'g Trans. May 12, 2016 at 10:30:00– 10:30:30 (Canada).

**MEMORANDUM OPINION**                                                    **Page 9**

some kind of tangible or intangible asset or interest in an entity—involved the revelation of a detailed strategy for how to avoid taxes, or so the Heritage clients were told.

While Canada only sold the Heritage Transactions for a few years, he made quite a bit of money doing so. However, Canada's relationship with Heritage and its primary principal, Kornman, eventually soured due to a dispute over compensation, and Canada left Heritage in 2002.[35] In April 2004, Canada won an arbitration award in excess of $6 million related to this compensation dispute.[36] Shortly thereafter, in May 2004, Heritage filed its voluntary petition under Chapter 11 in this Court, and Canada actively participated in the Heritage bankruptcy case in order to collect his arbitration award against Heritage.[37] A plan of reorganization filed by the Chapter 11 trustee of Heritage was ultimately confirmed on September 12, 2007.[38]

Canada received a letter dated February 12, 2007 from the IRS informing him that it was investigating him for possible liability for penalties under 26 U.S.C. § 6707.[39] However, it was not until April 2015 that the IRS informed Canada of its intention to impose over $40 million in penalties against him pursuant to 26 U.S.C. § 6707 as a result of his actions as a Heritage employee.[40] Canada then filed his voluntary petition under Chapter 11 on September 9, 2015, in

---

[35] *In re Heritage Organization, L.L.C.*, 2006 WL 6508182 (Bankr. N.D. Tex. 2006).

[36] *Id.* at *4.

[37] *See* Case No. 04-35574-BJH-11.

[38] *Id.*

[39] Debtor's Ex. 46 ("Dear Mr. Canada: We have initiated an investigation of your promotional activities in connection with certain partnership transactions substantially similar to the type described in Notice 2000-44. 2000-2 C.B. 255. Our investigation may result in further action, including a determination that you are jointly and severally liable for tax shelter promoter penalties imposed by I.R.C. §§ 6707 and 6708, as in effect and applicable to such activities prior to October 22, 2004.").

[40] Debtor's Ex. 10 ("We are notifying you of penalties under Internal Revenue Code (IRC) section 6707. The IRC § 6707 penalties are for your failure to register a tax shelter as required by IRC § 6111 and the associated regulations.").

**MEMORANDUM OPINION** **Page 10**

order to address the IRS' penalty claim against him.  The IRS filed the Original Proof of Claim

on October 15, 2015.[41]  On December 7, 2015, Canada filed the Original Claim Objection.[42]  On

January 12, 2016, the IRS filed the Amended Proof of Claim.[43]  Canada moved for summary

judgment on statute of limitations and various preclusion grounds on February 2, 2016,[44] which

motion was denied by an Order entered on April 8, 2016.[45]  As noted previously, the Court heard

the Claim Objections on May 12 and 13, 2016.

## III.    LEGAL ANALYSIS

### A.    Burden of Proof-26 U.S.C. § 7491(c)

As the Court orally ruled at the hearing on the Claim Objections, the burden of proving

that Canada is liable for penalties under 26 U.S.C. § 6707 lies with the IRS.[46]  Under Federal

Bankruptcy Rule of Procedure 3001(f), a proof of claim executed and filed in accordance with

the Federal Bankruptcy Rules of Procedure is prima facie evidence of the validity and the

---

[41] Case No. 15-33757-BJH-11, Claim No. 4-1. The Original Proof of Claim was for $40,286,499. All but $100 of the Original Proof of Claim was for civil penalties related to violations of 26 U.S.C. § 6707 that occurred in tax year 1998. The $100 represented income tax liability for tax year 2014. The Original Proof of Claim asserted that its entire amount was entitled to priority treatment under 11 U.S.C. § 507(a)(8).

[42] Case No. 15-33757-BJH-11, Original Claim Objection [ECF No. 40].  The Debtor supplemented the Original Claim Objection with the Supplemental Claim Objection, filed on April 8, 2016, "to better articulate certain of the constitutional objections asserted in Debtor's initial objections or to clarify such constitutional objections with more specificity." Case No. 15-33757-BJH-11, Supplemental Claim Objection at 1 [ECF No. 82].

[43] Case No. 15-33757-BJH-11, Claim No. 4-2.  The amount of 26 U.S.C. § 6707 liability asserted in the Amended Proof of Claim remained the same as it was in the Original Proof of Claim, but the asserted income tax liability for 2014 increased to $58,328.88. This brought the total liability asserted in the Amended Proof of Claim up to $40,346,167.87. According to Debtor's Original Claim Objection, the 2014 income taxes "are not the subject of this Objection and will be paid pursuant to Debtor's plan of reorganization…" Original Claim Objection ¶ 3 n.1. In addition, the Amended Proof of Claim asserted that only the $58,328.88 in income tax liability was entitled to priority treatment under 11 U.S.C. § 507(a)(8), eliminating the need to address any dispute as to whether penalties under 26 U.S.C. § 6707 are subject to priority treatment, at least in the context of this Memorandum Opinion.

[44] Case No. 15-33757-BJH-11, Canada's Motion for Summary Judgment [ECF No. 70].

[45] Case No. 15-33757-BJH-11, Order on Canada's Motion for Summary Judgment [ECF No. 81].

[46] Hr'g Trans. May 12, 2016 at 9:38:55 – 9:39:10 (Court).

---

**MEMORANDUM OPINION**                                                          **Page 11**

amount of the claim.[47]   Once the prima facie validity of a proof of claim is established, the

burden of going forward with the evidence then shifts to the objecting party (here Canada) to

produce evidence at least equal in probative force to that offered by the proof of claim and

which, if believed, would refute at least one of the allegations that is essential to the claim's legal

sufficiency.[48]   This can be done by the objecting party producing specific and detailed

allegations that place the claim into dispute, by the presentation of legal arguments based upon

the contents of the claim and its supporting documents, or by the presentation of pretrial

pleadings, such as a motion for summary judgment, in which evidence is presented to bring the

validity of the claim into question.[49]   As the Court's analysis below demonstrates, Canada has—

through both his legal argument and the evidence he presented—produced evidence at least

equal in probative force to that offered by the Amended Proof of Claim.[50]

This brings us to the next step of the burden of proof analysis.  In 2000, the Supreme

Court held in the context of a tax claim that "bankruptcy does not alter the burden imposed by

the substantive law."[51]   Thus, once an objecting party produces evidence rebutting a proof of

claim, the burden of proof then lies with whichever party it would normally according to the

relevant substantive law.[52]   Under 26 U.S.C. § 7491(c), "[n]otwithstanding any other provision

---

[47] FED. R. BANKR. P. 3001(f). Canada apparently agrees that the Amended Proof of Claim is entitled to prima facie validity under Federal Bankruptcy Rule of Procedure 3001(f), as he does not argue otherwise.

[48] *In re Wyly*, Case No. 14-35043-BJH-11[ECF No. 1247], at 37 (Bankr. N.D. Tex. 2016) (quoting *In re Margaux City Lights Partners, Ltd.*, 2014 WL 6668982, at *3).

[49] *Id.*

[50] *See* pp. 19-37, *infra*.

[51] *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 17 (2000).

[52] *In re Wyly*, Case No. 14-35043-BJH-11 [ECF No. 1247], at 30-31 (citing *In re 1701 Commerce, LLC*, 511 B.R. 812, 822 (Bankr. N.D. Tex. 2014); *In re Aviva America, Inc.*, 2005 WL 6441404, at *3-*4 (Bankr. N.D. Tex. 2005) (quoting *In re Armstrong*, 320 B.R. 97, 102-03 (Bankr. N.D. Tex. 2005))).

**MEMORANDUM OPINION**                                                                    **Page 12**

of this title, the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title."[53] Thus, the IRS has the burden of production and must come forward with "sufficient evidence" that it is appropriate to impose penalties under 26 U.S.C. §6707 on Canada under a preponderance of the evidence standard.[54] In contrast, and according to the Fifth Circuit, Canada has the burden of proof when it comes to establishing his reasonable cause defense,[55] which he must carry by a preponderance of the evidence.[56]

### B. The Statutory Framework

Because 26 U.S.C. §§ 6111 and 6707 were amended in 2004, two years after Canada left Heritage's employment, the current versions of those statutes do not control his possible liability for failure to register the Heritage Transactions as tax shelters. Instead, the versions of the statutes that were effective from August 5, 1997 until October 22, 2004 control.[57] As will be shown below, the statutes that control Canada's potential liability are complicated and technical; and there is next to no case authority interpreting those statutes. Thus, it is necessary to closely examine the statutory text, which the Court now does.

During the Relevant Time Period, 26 U.S.C. § 6111(a) provided that: "[a]ny tax shelter organizer shall register the tax shelter with the Secretary (in such form and in such manner as the

---

[53] 26 U.S.C. § 7491(c).

[54] 26 U.S.C. § 7491(c); *see In re Wyly*, Case No. 14-35043-BJH-11 [ECF No. 1247], at 49; *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 91 (2003) (deciding that where a statute was silent as to the applicable burden of proof standard, that "the conventional rule of civil litigation…which requires a plaintiff to prove his case by a preponderance of the evidence using direct or circumstantial evidence" should apply).

[55] *Brinkley v. C.I.R.*, 808 F.3d 657, 668 (5th Cir. 2015) (citing *Klamath Strategic Investment Fund v. United States*, 568 F.3d 537, 548 (5th Cir. 2009)).

[56] *See Desert Palace, Inc.*, 539 U.S. at 91; *CNT Investors, LLC v. C.I.R.*, 144 T.C. 161, 223 (2015).

[57] 26 U.S.C. § 6111 (1998) (amended 2004); 26 U.S.C. § 6707 (1998) (amended 2004).

Secretary may prescribe) not later than the day on which the first offering for sale of interests in such tax shelter occurs."[58]  Thus, for registration requirements under 26 U.S.C. § 6111(a) to apply to Canada, two things must be true.  First, the Heritage transactions must be a "tax shelter."  Second, Canada must be a "tax shelter organizer."

The term "tax shelter" as applicable here is defined in 26 U.S.C. § 6111(c) as follows:[59]

> (c) Tax shelter.--For purposes of this section--
> (1) In general.--The term "tax shelter" means any *investment*--
> (A) with respect to which any person could reasonably infer from the representations made, or to be made, *in connection with the offering for sale of interests in the investment* that the tax shelter ratio for any investor as of the close of any of the first 5 years ending after the date on which such *investment is offered for sale* may be greater than 2 to 1, and
> (B) which is--
> (i) required to be registered under a Federal or State law regulating securities,
> (ii) sold pursuant to an exemption from registration requiring the filing of a notice with a Federal or State agency regulating the offering or sale of securities, or
> (iii) a substantial investment.

26 U.S.C. § 6111(c) goes on to define many of the terms used in its definition of "tax shelter," including "tax shelter ratio" and "substantial investment."[60]  As the text and the structure of 26 U.S.C. § 6111 indicate, the definition of "tax shelter" provided by 26 U.S.C. § 6111(c) is not colloquial.  Instead, it is a highly technical term of art that seems to have been crafted

---

[58] 26 U.S.C. § 6111(a) (1998) (amended 2004).

[59] 26 U.S.C. § 6111(c) (1998) (amended 2004) (emphasis added).

[60] 26 U.S.C. § 6111(c)(2)-(4) (1998) (amended 2004).

**MEMORANDUM OPINION**                                    **Page 14**

specifically for the purposes of 26 U.S.C. § 6111.[61]

Although the definition of "tax shelter" under 26 U.S.C. § 6111(c) has many parts, Canada's argument against his own liability under 26 U.S.C. § 6707 focuses on a basic, threshold requirement erected by 26 U.S.C. § 6111(c)—*i.e.*, that a "tax shelter" must be an "investment."[62] Canada argues that the Heritage Transactions—which are best characterized as an idea or a strategy—cannot be understood as an "investment" being offered for sale, and thus cannot fall under the definition of "tax shelter" provided by 26 U.S.C. § 6111(c)(1).[63]

In addition to the definition of "tax shelter" stated in 26 U.S.C. § 6111(c), 26 U.S.C. § 6111(d) contains an alternative definition of "tax shelter."[64] The IRS does not argue that this alternative definition applies to Canada or the Heritage Transactions, nor could it. Nevertheless, comparing the 26 U.S.C. § 6111(d) definition of a "tax shelter" to the 26 U.S.C. § 6111(c) definition of a "tax shelter" will help to answer the question of whether the term "investment" used in 26 U.S.C. § 6111(c) encompasses ideas or strategies like the Heritage Transactions.

26 U.S.C. § 6111(d) provides in pertinent part that:

> (d) Certain confidential arrangements treated as tax shelters.--
>> (1) In general.--For purposes of this section, the term "tax shelter" includes any entity, plan, arrangement, or transaction--
>>> (A) a significant purpose of the structure of which is the avoidance or evasion of Federal income tax for a direct or indirect participant which is a corporation,
>>> (B) which is offered to any potential participant under conditions of confidentiality, and

---

[61] 26 U.S.C. § 6111(c) (1998) (amended 2004) (stating that the definition of "tax shelter" is "[f]or purposes of this section.").

[62] *Id.*

[63] 26 U.S.C. § 6111(c)(1) (1998) (amended 2004) ("(c) Tax shelter.--For purposes of this section--(1) In general.--The term 'tax shelter' means any *investment*…" (emphasis added)).

[64] 26 U.S.C. § 6111(d) (1998) (amended 2004).

**MEMORANDUM OPINION**                                                                 **Page 15**

        (C) for which the tax shelter promoters may receive fees in excess
of $100,000 in the aggregate.

This alternative definition of a tax shelter—which broadly includes entities, plans, arrangements, and transactions offered under conditions of confidentiality—would seem to be perfectly tailored to capture the Heritage Transactions but for one requirement that is not met here—*i.e.*, it requires the involvement of a corporate taxpayer.[65]  As will be explained further below, the use of the terms "entity, plan, arrangement, or transaction" in 26 U.S.C. § 6111(d) but not in 26 U.S.C. § 6111(c) strongly suggests that these words are not captured by the term "investment" as it is used in 26 U.S.C. § 6111(c).

      For Canada to be liable for penalties under 26 U.S.C. § 6707, it is not enough that the Heritage Transactions are a "tax shelter."  Canada himself must also be a "tax shelter organizer."  The term "tax shelter organizer" is also defined in 26 U.S.C. § 6111:[66]

    (e) Other definitions.--For purposes of this section--
      (1) Tax shelter organizer.--The term "tax shelter organizer" means--
          (A) the person principally responsible for organizing the tax shelter,
          (B) if the requirements of subsection (a) are not met by a person described in subparagraph (A) at the time prescribed therefor, any other person who participated in the organization of the tax shelter, and
          (C) if the requirements of subsection (a) are not met by a person described in subparagraph (A) or (B) at the time prescribed therefor, any person participating in the sale or management of the investment at a time when the tax shelter was not registered under subsection (a).

---

[65] 26 U.S.C. § 6111(d)(1)(A) (1998) (amended 2004) ("(1) In general.--For purposes of this section, the term 'tax shelter' includes any entity, plan, arrangement, or transaction--(A) a significant purpose of the structure of which is the avoidance or evasion of Federal income tax *for a direct or indirect participant which is a corporation*…." (emphasis added)).

[66] 26 U.S.C. § 6111(e)(1) (1998) (amended 2004).

**MEMORANDUM OPINION**                                  **Page 16**

Since the Heritage Transactions were never registered under 26 U.S.C. § 6111, all three definitions of "tax shelter organizer" provided for in 26 U.S.C. § 6111(e) apply.  Thus, Canada is a "tax shelter organizer" if he (i) was the person principally responsible for organizing the tax shelter, (ii) participated in the organization of the tax shelter, or (iii) participated in the sale or management of the investment.[67]  Since Canada can only be a "tax shelter organizer" if he organized a "tax shelter" or sold an "investment," whether he is a "tax shelter organizer" ultimately depends on whether the Heritage Transactions are captured by the terms "investment" and "tax shelter" as they are used in 26 U.S.C. § 6111(c).

The consequences of a tax shelter organizer's failure to register a tax shelter under 26 U.S.C. § 6111 during the Relevant Time Period are laid out in 26 U.S.C. § 6707.  Specifically, the version of 26 U.S.C. § 6707 effective during the Relevant Time Period provides that a person who is required to register a tax shelter under 26 U.S.C. §§ 6111(a) and (c) but fails to do so shall pay a penalty equal to the greater of 1 percent of the aggregate amount invested in the tax shelter or $500.[68]  In contrast, a person who is required to register a tax shelter under 26 U.S.C. §§ 6111(a) and (d) but fails to do so shall pay a penalty equal to at least 50 percent of the fees paid to all promoters of the tax shelter with respect to offerings made before the tax shelter is registered or $10,000.[69]  According to 26 U.S.C. § 6707(a)(1), any failure to register that is due to reasonable cause will not result in a penalty.[70]

---

[67] 26 U.S.C. § 6111(e)(1) (1998) (amended 2004).

[68] 26 U.S.C. § 6707(a)(1), (a)(2) (1998) (amended 2004).

[69] 26 U.S.C. § 6707(a)(1), (a)(3) (1998) (amended 2004). 26 U.S.C. § 6707(a)(3) provides that 75 percent of the fees shall be paid in the case of an intentional failure to register.

[70] 26 U.S.C. § 6707(a)(1) (1998) (amended 2004).

**MEMORANDUM OPINION**                                                                                          **Page 17**

Other than the statutory text outlined above, there are very few materials available to guide the Court's interpretation of 26 U.S.C. §§ 6111 and 6707.  Only a handful of cases even cite to these statutes, and none of them address the proper interpretation of the terms "tax shelter," "tax shelter organizer," or "investment" as they are used in 26 U.S.C. § 6111(c).  Although "temporary" treasury regulations interpreting 26 U.S.C. § 6111 (the "**Temporary Regulations**") were promulgated in 1984 and remain effective to this day, they are of little assistance to the Court.[71]  This is because the Temporary Regulations do not provide a definition of the term "investment" as it is used in 26 U.S.C. § 6111(c), and thus do nothing to support the IRS' argument that the Heritage Transactions can be considered an investment for purposes of the statute.[72]

Finally, it should be noted that 26 U.S.C. §§ 6111 and 6707 were revised from the ground up in 2004.[73]  In lieu of the requirements in place during the Relevant Time Period, 26 U.S.C. § 6111 now requires that any "material advisor with respect to any reportable transaction" file a return regarding that reportable transaction.[74]  Under the current version of 26 U.S.C. § 6111(c),

---

[71] 26 C.F.R. § 301.6111-1T (1998) (amended 2008). The IRS apparently regularly issues "temporary" regulations that are not temporary at all, and in fact remain in force for many years. *See* Juan F. Vasquez, Jr. and Peter A. Lowy, *Challenging Temporary Treasury Regulations: An Analysis of the Administrative Procedure Act, Legislative Reenacment Doctrine, Deference, and Invalidity*, 3 Hous. Bus. & Tax L.J. 248, 253-54 (2003) (describing the concept of "permanently temporary" IRS regulations); *see also* Kristen E. Hickman, *Unpacking the Force of Law*, 66 Vand. L. Rev. 465, 471 (2013) ("Treasury and the IRS have been using temporary regulations to impose controversial interpretations of the tax laws on taxpayers for more than twenty years.").

[72] *See* 26 C.F.R. § 301.6111-1T (1998) (amended 2008). Indeed, although the Temporary Regulations make no attempt to define the term "investment" as it is used in 26 U.S.C. § 6111(c), it is noteworthy that none of the examples of tax shelters that are incidentally provided in 26 C.F.R. § 301.6111-1T bear any resemblance to the Heritage Transactions.  *See* 26 C.F.R. § 301.6111-1T (1998) (amended 2008) (containing examples including an investment in a building (A-9), a master recording (A-22), real estate (A-22), and a "corporation to feed cattle and to provide services in connection with the cattle feeding operations" (A-24A)).

[73] 26 U.S.C. §§ 6111, 6707.

[74] 26 U.S.C. § 6111(a).

the Secretary of the Treasury determines via regulations whether something constitutes a reportable transaction.[75]  The legislative history of 26 U.S.C. §§ 6111 and 6707 does not shed much light on the reasons for this drastic change to these statutory provisions, but it seems clear that the potential realm of reporting requirements under the current version of 26 U.S.C. § 6111 sweeps far broader than it did under the version of the statute that was effective during the Relevant Time Period.[76]

> ### C.    As Applied Here
>
> #### 1.  Are the Heritage Transactions an "Investment" and thus a "Tax Shelter" under 26 U.S.C. § 6111(c)?

The definition of "tax shelter" under 26 U.S.C. § 6111(c) begins with the phrase "[t]he term 'tax shelter' means any *investment*…" and goes on to characterize an "investment" as something of which "interests" are "offered for sale."[77]  Thus, in order for the Heritage Transactions to be a "tax shelter," they must first be an investment.[78]  For the reasons explained below, the Heritage Transactions were not "investments."

First, the plain meaning of the word "investment" does not encompass the Heritage Transactions.  According to the Supreme Court, "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."[79]  For statutory language to be ambiguous (*i.e.*, not plain), "it

---

[75] *See* 26 U.S.C. §§ 6111(b)(2), 6707A(c).

[76] *See* H.R. REP. 108-548(I), 270 (explaining that the change to §§ 6111 and 6707 "…repeals the present-law penalty for failure to register tax shelters.").

[77] 26 U.S.C. § 6111(c)(1) (1998) (amended 2004) (emphasis added).

[78] *Id.*

[79] *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004).

**MEMORANDUM OPINION**                                                    **Page 19**

must be susceptible to more than one reasonable interpretation or more than one accepted meaning."[80] Under Fifth Circuit precedent, various canons of statutory interpretation can be used in order to either determine in the first instance whether statutory language is ambiguous or to resolve those ambiguities when they are identified.[81] Both the plain meaning of the word "investment" and the canons of statutory interpretation point toward the same result here—that the Heritage Transactions are not a "tax shelter" under 26 U.S.C. § 6111(c).

Although 26 U.S.C. § 6111(c) does not provide a definition of "investment," Black's Law Dictionary defines "investment" as "[a]n expenditure to acquire property or assets to produce revenue; a capital outlay" or "[t]he asset acquired or the sum invested."[82] The phrase "capital outlay" is in turn defined as "[a]n outlay of funds to acquire or improve a fixed asset…" or as "[m]oney expended in acquiring, equipping, and promoting a business."[83] The Heritage Transactions are not covered by any of these senses of the word "investment," or by a common sense, everyday understanding of the word. The Heritage Transactions are not (i) a revenue-producing asset such as real estate, (ii) a share of a business entity, or (iii) funds expended to acquire those kinds of assets or to fund a business. Instead, the evidence shows that the Heritage Transactions are more properly thought of as ideas or, according to the term used in the Heritage contracts, strategies.[84]

---

[80] *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 518-19 (5th Cir. 2004).

[81] *U.S. v. Kaluza*, 780 F.3d 647, 658 & n.34 (5th Cir. 2015).

[82] *Investment*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[83] *Capital Outlay*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[84] *See, e.g.*, IRS Ex. M at A 0001.

**MEMORANDUM OPINION** **Page 20**

The strategies that made up the Heritage Transactions consisted of a wide universe of information that would be "…divulged, described, communicated, detailed, arranged or identified by [Heritage]."[85]  The value that Heritage provided for its clients was not embodied in the shares of a particular partnership entity or LLC that a client might ultimately employ. Instead, Heritage provided value to its clients by providing instructions on how to use those entities in order to purportedly generate massive tax benefits.  As the Heritage contracts stated, "the usefulness and value of the Strategies [was] attributable to the timing, sequencing and combinations of the various non-proprietary components of the Strategies and/or to the fact that the Strategies may not be known to the Principals even though they may be known to others."[86] Just as someone who offers to tell you—for a price—which tech stocks are booming or what Manhattan real estate is appreciating is not selling you shares in Google or an ownership interest in the Flatiron Building, Canada was not selling an investment when he sold the Heritage Transactions.  Instead, he was selling an idea or strategy for how to create artificial tax benefits. The Heritage Transactions simply do not fall under the plain meaning of the term "investment," and therefore the Heritage Transactions are not "tax shelters."

Even if the plain meaning of "investment" did not counsel against the IRS' argument that the Heritage Transactions are a "tax shelter," a statutory interpretation principle that the Supreme Court has called "one of the most basic interpretive canons" also counsels against classifying the

---

[85] *Id.* at A 0005. Another version of the definition of "Strategies" used by Heritage was "the contracts, Persons identified, facts, data, knowledge, documentation, opinions, concepts, ideas, techniques, methods, transactions, combinations, sequences of events, timing, financial models, diagrams, illustrations, and procedures divulged, described, communicated, detailed, arranged or identified by [Heritage] and all variations, modifications, sequences, rearrangements and recombinations thereof." IRS Ex. M at A 0005.

[86] IRS Ex. M at A 0002.

**MEMORANDUM OPINION**                                                                    **Page 21**

Heritage Transactions as "tax shelters" under 26 U.S.C. § 6111(c).[87] According to the Supreme Court, "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."[88] In particular, it is usually true that "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."[89] The Fifth Circuit agrees, noting that it is a general canon of statutory interpretation that "different words within the same statute should, if possible, be given different meanings."[90]

As noted previously, 26 U.S.C. § 6111 contains two distinct definitions of tax shelter— 26 U.S.C. § 6111(c) and 26 U.S.C. § 6111(d). Where the 26 U.S.C. § 6111(c) definition of "tax shelter" encompasses only "investments,"[91] the 26 U.S.C. § 6111(d) definition of "tax shelter" "includes any entity, plan, arrangement, or transaction…," terms that come much closer to capturing the essence of the Heritage Transactions than the term "investment."[92] The IRS argues that the term "investment" as it is used in 26 U.S.C. § 6111(c) should be understood to cover the Heritage Transactions, which as the Court found above are best characterized as an idea or strategy. However, the interpretation advocated by the IRS would read the phrase "plan, arrangement, or transaction" out of 26 U.S.C. § 6111(d). If the term "investment" could be understood to encompass an idea or strategy such as the Heritage Transactions, then it would be

---

[87] *Corley v. U.S.*, 556 U.S. 303, 314 (2009).

[88] *Corley*, 556 U.S. at 314 (internal marks omitted) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

[89] *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004).

[90] *BNSF Railway Co. v. U.S.*, 775 F.3d 743, 755 n.86 (5th Cir. 2015) (quoting *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 991 (7th Cir. 2001)).

[91] 26 U.S.C. § 6111(c) (1998) (amended 2004).

[92] 26 U.S.C. § 6111(d) (1998) (amended 2004).

**MEMORANDUM OPINION** **Page 22**

unnecessary to employ the terms "plan, arrangement, or transaction"—terms that seem well suited to capturing things like the Heritage Transactions—in the definition of "tax shelter" contained in 26 U.S.C. § 6111(d). The term "investment" could simply be used in both 26 U.S.C. § 6111(c) and (d) to cover arrangements such as the Heritage Transactions. This cannot be the correct interpretation. According to the canon of statutory interpretation cited above, the fact that Congress used the phrase "entity, plan, arrangement, or transaction" in 26 U.S.C. § 6111(d) but the word "investment" in 26 U.S.C. § 6111(c) indicates that an "investment" is something other than a plan, arrangement, or transaction. For this additional reason, the IRS' interpretation of 26 U.S.C. § 6111(c) must be rejected.

One further canon of statutory interpretation counsels against imposing penalties against Canada under 26 U.S.C. § 6707 based on a liberal meaning of the word "investment" in 26 U.S.C. § 6111(c). The Fifth Circuit has held that ambiguities in tax penalty statutes should be construed against the government.[93] The Fifth Circuit has characterized this interpretive principle as a "longstanding canon of construction…."[94] Here, if the Heritage Transactions fit within the definition of "investment" as it is laid out in 26 U.S.C. § 6111(c)—and therefore within the definition of a "tax shelter"—then this fit is a very odd one indeed. Such a result could only be reached via a strained reading of 26 U.S.C. § 6111, and applying such a strained reading in order to impose penalties upon Canada would run counter to the Supreme Court's

---

[93] *U.S. v. Marshall*, 798 F.3d 296, 318 (5th Cir. 2015).
[94] *Id.*; *see Allen v. Atlanta Metallic Casket Co.,* 197 F.2d 460, 461 (5th Cir. 1952).

**MEMORANDUM OPINION**                                                    **Page 23**

maxim that "one 'is not to be subjected to a penalty unless the words of the statute plainly impose it.'"[95]

The IRS has not cited the Court to any authority—nor has the Court been able to locate any authority through its own research—that counsels a result different from those reached via the plain language of 26 U.S.C. § 6111 or the application of the canons of statutory interpretation cited above.[96] The few cases that interpret 26 U.S.C. §§ 6111 and 6707 either involve tax shelters that utilize what are clearly "investments" in the traditional sense,[97] or arise in procedural postures that do not require the courts to reach the merits of the issue of whether 26 U.S.C. § 6111 applies.[98] Thus—as far as this Court is aware—no other court has reached a result

---

[95] *C.I.R. v. Acker*, 361 U.S. 87, 91 (1959) (quoting *Keppel v. Tiffin Savings Bank*, 197 U.S. 356, 362 (1905)); *see also Ivan Allen Co. v. U. S.*, 422 U.S. 617, 627 (1975) (tax penalties are strictly construed); *Rand v. C.I.R.*, 141 T.C. 376, 393 (2013) (stating that "[t]he law is settled that 'penal statutes are to be construed strictly,' and that one 'is not to be subjected to a penalty unless the words of the statute plainly impose it'" and refusing to apply a penalty under 26 U.S.C. § 6662.); *Mohamed v. C.I.R.*, 106 T.C.M. (CCH) 537, 2013 WL 5988943, at *10 (2013) (strictly construing a tax penalty statute in favor of the taxpayer while noting that "[t]he application of that strict-construction canon to tax law no longer enjoys universal approval.").

[96] The only authority the Court was able to independently locate that could even conceivably counsel a different result is cryptic language in an IRS Notice indicating that certain transactions involving tax avoidance using artificially high basis "may already be subject to the tax shelter registration and list maintenance requirements of § 6111…." IRS Notice 2000-44, 2000-2 C.B. 255. A vague assertion—without analysis or explanation—that certain types of transactions "may" be subject to registration requirements hardly counts as authoritative agency guidance upon which this Court or a taxpayer can rely. Even if IRS Notice 2000-44 unequivocally stated that transactions such as the Heritage Transactions are subject to registration requirements under 26 U.S.C. § 6111, which it does not, the Fifth Circuit has recently held that an IRS Notice that features no analysis or explanation and runs counter to the plain language of the statute it interprets is "unworthy of deference." *BMC Software, Inc. v. C.I.R.*, 780 F.3d 669, 676 (5th Cir. 2015). Inasmuch as IRS Notice 2000-44 stands for the proposition that an idea or strategy is subject to registration requirements under the version of 26 U.S.C. § 6111 effective during the Relevant Time Period, it contains no analysis or explanation supporting this conclusion and runs counter to the plain language of the statute it interprets. Thus, it is unworthy of deference and the Court does not rely on it.

[97] *See In re Mitchell*, 109 B.R. 434, 435 (Bankr. W.D. Wash. 1989) ("In 1983 or 1984 Mitchell organized his own tax shelter which was a limited partnership known as Cascade Hydro. Mitchell was the general partner. The investors were the limited partners. The purpose of Cascade Hydro was to own, construct and operate two small hydro-electric plants in Whatcom County, Washington, one on Spring Creek and the other on Sygitowicz Creek.") (judgment reversed in subsequent determination by *In re Mitchell*, 977 F.2d 1318 (9th Cir. 1992)).

[98] *See, e.g.*, *U.S. v. BDO Seidman, LLP*, 492 F.3d 806, 825 n.19 (7th Cir. 2007) (whether the IRS could enforce a summons); *Pfaff v. United States*, 2016 WL 915738 (D. Colo. 2016) (whether a tax shelter organizer must pay the

---

**MEMORANDUM OPINION**                                                                 **Page 24**

that runs counter to this Court's interpretation of 26 U.S.C. § 6111. In addition, the Temporary Regulations interpreting 26 U.S.C. § 6111 simply do not address the proper definition of the term "investment" as it is used in 26 U.S.C. § 6111(c).[99] Even were the Court to defer to the Temporary Regulations under *Chevron*, such deference would provide no additional support for the IRS' argument.[100]

---

entire 26 U.S.C. § 6707 penalty before a district court has subject matter jurisdiction to review imposition of the penalty).

[99] *See* 26 C.F.R. § 301.6111-1T (1998) (amended 2008). Although the IRS points out that the Temporary Regulations define the phrase "sale of an interest in a tax shelter" broadly as including "the sale of property, or any interest in property, the entry into a leasing arrangement, a consulting, management or other agreement for the performance of services, or the sale or entry into any other plan, investment, or arrangement," this argument does not support a broad definition of the phrase "tax shelter" under 26 U.S.C. § 6111(c) for two reasons. *See* 26 C.F.R. § 301.6111-1T at A-42. First, the Temporary Regulations' definition of "sale of an interest in a tax shelter" seems to be aimed at 26 U.S.C. § 6111(b), not 26 U.S.C. § 6111(c). 26 U.S.C. § 6111(b) requires "[a]ny person who sells (or otherwise transfers) an interest in a tax shelter [to] furnish to each investor who purchases (or otherwise acquires) an interest in such tax shelter from such person the identification number assigned by the Secretary to such tax shelter." While the term "tax shelter" is specifically defined in 26 U.S.C. § 6111(c), what it means to be a person who "sells…an interest in a tax shelter" for the purposes of 26 U.S.C. § 6111(b) is not defined by the statute, leaving room for the regulatory interpretation provided by the Temporary Regulations. Second, to the extent that the Temporary Regulations' definition of "sale of an interest in a tax shelter" attempts to broaden the definition of "tax shelter" provided by 26 U.S.C. § 6111(c), the Temporary Regulations are not entitled to deference under *Chevron*. According to the Fifth Circuit and the Supreme Court, before giving a regulation deference under *Chevron*, "[f]irst we must ask whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguous expressed intent of Congress." *BNSF Railway Co. v. U.S.*, 775 F.3d 743, 751 (5th Cir. 2015) (internal quotation marks omitted) (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984)). The Fifth Circuit has also held that "[i]n evaluating the clarity of Congressional direction, we apply the traditional tools of statutory interpretation, including text, structure, purpose, and legislative history." *Id.* (internal quotation marks and footnotes omitted). Here, the text and structure of 26 U.S.C. § 6111 indicate that Congress could hardly have spoken more clearly as to the proper definition of "tax shelter" under 26 U.S.C. § 6111. Two entire subsections of the statute—26 U.S.C. §§ 6111(c) and (d)—are devoted to the definition of this phrase. Since Congress has directly spoken to the precise question at issue here—the definition of "tax shelter"—any attempt to broaden that definition through the Temporary Regulations' definition of "sale of an interest in a tax shelter" fails the first step of the *Chevron* analysis and is thus not worthy of deference.

[100] In fact, the Temporary Regulations themselves do much to undermine the IRS' argument. First, the examples of investments provided by 26 C.F.R. § 301.6111-1T all look nothing like the Heritage Transactions, and therefore tend to support Canada's interpretation of 26 U.S.C. § 6111 rather than the IRS'. *See* 26 C.F.R. § 301.6111-1T (1998) (amended 2008). The examples all involve the promotion of traditional investment opportunities rather than the sale of a strategy; including an investment in a building (A-9), a master recording (A-22), real estate (A-22), and a "corporation to feed cattle and to provide services in connection with the cattle feeding operations" (A-24A). Second, the Temporary Regulations' definition of who constitutes a "tax shelter organizer" does not seem to contemplate a tax shelter like the Heritage Transactions under 26 U.S.C. § 6111(c). For example, according to the

**MEMORANDUM OPINION** **Page 25**

Thus, the principles of statutory interpretation discussed above lead the Court to conclude that the Heritage Transactions cannot be considered to be an "investment" under 26 U.S.C. § 6111(c).  Since the Heritage Transactions are not "investments," they do not fall under the statutory definition of a "tax shelter" provided in 26 U.S.C. § 6111(c).  Since only "tax shelters" must be registered under 26 U.S.C. § 6111(a), this means that Canada is not liable for penalties under 26 U.S.C. § 6707.

### 2. Alternatively, Assuming that the Heritage Transactions were "Investments" and thus a "Tax Shelter," is Canada a "Tax Shelter Organizer" under 26 U.S.C. § 6111(e)?

Although the Court need not reach the question of whether Canada is a "tax shelter organizer" under 26 U.S.C. § 6111(e) given the conclusion reached above, it does so in the event that an appellate Court disagrees with its conclusion that the Heritage Transactions do not meet the definition of a "tax shelter" under 26 U.S.C. § 6111(c).  To review, since the Heritage Transactions were never registered as a tax shelter, Canada is a "tax shelter organizer" if he (i) was the person principally responsible for organizing the tax shelter, (ii) participated in the organization of the tax shelter, or (iii) participated in the sale or management of the investment.[101]  If the Heritage Transactions are in fact "investments" and thus a "tax shelter," then it is clear that at the very least Canada participated in the sale or management of the

---

Temporary Regulations, in certain instances a tax shelter organizer can be someone who establishes the tax shelter by preparing articles of incorporation or a partnership agreement for the tax shelter, who creates a prospectus or offering memorandum regarding the tax shelter, or who prepares an appraisal related to the tax shelter. 26 C.F.R. § 301.6111-1T (1998) (amended 2008) (A-28).

[101] 26 U.S.C. § 6111(e)(1) (1998) (amended 2004).

**MEMORANDUM OPINION**                                                      **Page 26**

Heritage Transactions, making him a "tax shelter organizer" under 26 U.S.C. § 6111(e)(1)(C).[102]

Canada testified that he was hired by Heritage in order to help market and sell the Heritage Transactions.[103] He met with multiple prospective clients every week,[104] and was heavily involved in closing Heritage deals by ensuring that the clients' long-standing counsel did not interfere with the clients' decision to enter into a contract with Heritage and thus get access to the strategies Heritage was selling.[105] Although Canada testified that his title as Heritage's President and/or Chief Operating Officer came with little to no actual authority, the issue of how much authority Canada had over Heritage is irrelevant to whether Canada was a tax shelter organizer under 26 U.S.C. § 6111(e), assuming that the Heritage Transactions are a tax shelter. Under 26 U.S.C. § 6111(e)(1)(C), because no one ever registered the Heritage Transactions as a tax shelter, "any person participating in the sale or management of the investment at a time when the tax shelter was not registered under subsection (a)" qualifies as a tax shelter organizer.[106] If the Heritage Transactions can be classified as an "investment," then it is clear that Canada participated in the sale of the Heritage Transactions, and he would therefore be a "tax shelter

---

[102] 26 U.S.C. § 6111(e)(1)(C) (1998) (amended 2004). Although Canada argues that the terms of his employment agreement with Heritage delegated his registration responsibilities under 26 U.S.C. § 6111, he cites the Court to no authority that supports the proposition that his employment agreement is a valid delegation of this responsibility that would allow him to escape liability under 26 U.S.C. § 6707. The Court rejects this argument.

[103] 26 U.S.C. § 6111(e)(1) (1998) (amended 2004).

[104] Hr'g Trans. May 12, 2016 at 10:20:00 – 10:21:30 (Canada) (In a given month, Canada would have face-to-face contact with an average of three prospective clients a week).

[105] Hr'g Trans. May 12, 2016 at 10:37:25 – 10:38:30 (Canada) (One of Canada's functions was to deal with certain clients' attorneys); Hr'g Trans. May 12, 2016 at 10:50:30 – 10:53:40 (Canada) (Canada described a particular incident where he was instrumental in getting a Heritage client to sign a contract by dealing with the client's regular attorney and in drafting certain amendments to the normal Heritage contract).

[106] 26 U.S.C. § 6111(e)(1)(C) (1998) (amended 2004).

**MEMORANDUM OPINION**                                                                        **Page 27**

organizer" under 26 U.S.C. § 6111(e)(1)(C).[107]

**3. If the Heritage Transactions were "Investments" and thus a "Tax Shelter" that Canada was Required to Register under 26 U.S.C. § 6111, has he Established Reasonable Cause for Failing to Register Them under 26 U.S.C. § 6707(a)?**

In the event that an appellate court disagrees with this Court and concludes that the Heritage Transactions were "investments" and thus a "tax shelter" under 26 U.S.C. § 6111(c), this Court concludes that Canada carried his burden of proof and established reasonable cause under 26 U.S.C. § 6707 for his failure to register the Heritage Transactions as a tax shelter. Although the Court is not convinced that Canada's reliance on advice provided by Ahrens establishes his reasonable cause defense, for the reasons explained below it is satisfied that Canada's own examination of his possible reporting obligations under 26 U.S.C. § 6111, combined with a lack of an obvious way to fit the Heritage Transactions into the statutory framework of 26 U.S.C. § 6111 and the dearth of authority interpreting that statute, is sufficient to establish his reasonable cause defense here.

It is well established that reasonable cause may be shown via reliance on the advice of a tax professional. To establish reasonable cause based on reliance on a tax professional, it must be shown that the professional (i) had sufficient expertise to justify the reliance, (ii) was given all of the necessary, accurate information he or she needed in order to provide his or her advice, and (iii) that the person receiving the professional's advice actually relied in good faith on the professional's judgment.[108]    In certain situations, reliance on the advice of a tax professional

---

[107] *Id.*

[108] *Thomas v. C.I.R.*, 105 T.C.M. (CCH) 1403, 2013 WL 690599, at *3 (2013) (citing *Neonatology Assocs., P.A. v. Commissioner,* 115 T.C. 43, 98–99 (2000)).

**MEMORANDUM OPINION**                                                                **Page 28**

"may be unreasonable…when the person relied upon has an inherent conflict of interest."[109] 26 C.F.R. § 301.6708-1[110] notes that while a taxpayer may not normally rely on the advice of a tax professional who helped carry out a transaction in determining whether that transaction is subject to reporting requirements, it is also true that "[a]dvice from a tax professional who is not independent may be considered in determining reasonable cause if, in light of and in relation to all the other facts and circumstances, taking into account such advice is reasonable."[111]

Of course, reliance on the advice of a tax professional is not the only way to establish reasonable cause. As the Fifth Circuit has noted, reasonable cause is determined on a case-by-case basis, taking into account all of the facts and circumstances.[112] Specifically, IRS regulations defining reasonable cause for the purposes of accuracy-related penalties have noted that "[c]ircumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer."[113] The tax court has noted that it has "found it inappropriate to penalize taxpayers where a mistake of law was [made] in a

---

[109] *Neonatology Assocs.*, 115 T.C. at 98; *see also Gustashaw v. C.I.R.*, 696 F.3d 1124, 1139 (11th Cir. 2012) ("Reliance is not reasonable if the adviser was a promoter of the transaction or otherwise had a conflict of interest about which the taxpayer knew or should have known."); *Mortensen v. C.I.R.*, 440 F.3d 375, 387 (6th Cir. 2006) ("advice must generally be from a competent and independent advisor unburdened with a conflict of interest and not from promoters of the investment."); *Addington v. C.I.R.*, 205 F.3d 54, 59 (2d Cir. 2000) ("It is unreasonable for taxpayers to rely on the advice of someone who they know has a conflict of interest."); *Chamberlain v. C.I.R.*, 66 F.3d 729, 732 (5th Cir. 1995) ("taxpayers may not rely on someone with an inherent conflict of interest"); *Goldman v. C.I.R.*, 39 F.3d 402, 408 (2d Cir. 1994) (it is not reasonable for a taxpayer to rely on a professional they know is "burdened with an inherent conflict of interest.").

[110] This regulation discusses penalties for failures to keep lists of clients under the current tax shelter or "listed transaction" reporting regime.

[111] 26 C.F.R. § 301.6708-1T(g)(5)(i); *see* 26 C.F.R. § 301.6708-1T(g)(5)(ii) (defining an independent tax professional as a tax professional who is not a material advisor); 26 U.S.C. § 6111(b)(1) (defining material advisor).

[112] *Brinkley*, 808 F.3d at 669.

[113] 26 C.F.R. § 1.6664-4(b)(1).

**MEMORANDUM OPINION** **Page 29**

complicated subject area without clear guidance."[114] Reasonable cause established based on a mistake of law is generally limited "to situations in which the law was unclear, the taxpayer made a reasonable good-faith effort to comply with the law, and under all the facts and circumstances it would have been unfair to penalize the taxpayer for an honest mistake."[115] Even sophisticated parties can establish reasonable cause based on a mistake of law.[116]

Indeed, sometimes a high level of sophistication can make a mistake of law more, not less, reasonable. For example, *Svboda v. C.I.R.* involved a taxpayer with an MBA who had taught applied economics and who treated certain compensatory options he had received as capital gains rather than wage income.[117] Although the taxpayer's treatment of the options was incorrect under the Internal Revenue Code and he was thus liable for taxes, the tax court noted that "[f]rom an economic perspective, wherein petitioner's experience lies, there is some foundation for his position…," and that due to this fact the taxpayer had established reasonable cause.[118] The tax court has also indicated that cases of first impression, such as this one, are prime candidates for reasonable cause:

> We agree with petitioner that he made a reasonable attempt to comply with the Internal Revenue Code. Because this is a case of first impression, there was no clear authority to guide petitioner as to the complex and overlapping issues of tax and bankruptcy law. We note that respondent has not referred us to nor have we found any cases that have previously answered the questions before us. Petitioner had an honest misunderstanding of the law, and the position petitioner took was

---

[114] *Shao v. C.I.R.*, 100 T.C.M. (CCH) 182, 2010 WL 3377501, at *6 (2010) (citing *Van Wyk v. C.I.R.*, 113 T.C. 440, 449 (1999)).

[115] *Ochsner v. C.I.R.*, 99 T.C.M. (CCH) 1514, 2010 WL 2220305, at *8 (2010).

[116] *Alioto v. C.I.R.*, 101 T.C.M. (CCH) 1722, 2011 WL 2601511, at *1 (2011) (businessman with over twenty years of experience, but no tax experience).

[117] *Svoboda v. C.I.R.*, 92 T.C.M. (CCH) 393, 2006 WL 3103064 (2006).

[118] *Id.* at *7.

reasonably debatable. Accordingly, in light of all the facts and circumstances, we find petitioner acted reasonably and in good faith with respect to the underpayment for the years at issue and is not liable for the accuracy-related penalties under section 6662(a).[119]

In the end, the most important factor in establishing reasonable cause is the extent to which the person who is seeking to escape penalty liability sought to determine his proper liability in light of all of the circumstances.[120]

Thus, the Court must examine whether Canada's reliance on Ahrens and his own research efforts were sufficient to establish reasonable cause under all of the facts and circumstances here. Canada described the steps that he took to investigate his and Heritage's reporting and registration obligations as follows:

Well, Mr. Ahrens reminded us that there was a statute called 6111 out there. Which, frankly had he not reminded us I think I would have just thought it applied to corporate tax shelters. Part of it does. In a discussion of list-keeping and registration he raised 6111, and said that, in his opinion, the rest of the statute didn't apply, the part that would relate to individuals, because it related, and what I remember, and he explained it more broadly in his deposition, but what I remember is, is him saying it didn't apply to those old, it applied to those old oil and gas partnerships, where you get a number of investors and you sell it off. So I went and read 6111 and concluded it didn't apply for a variety of reasons, and then at some point I read the regulations and, and for a variety of reasons didn't see that they changed the result.[121]

Canada also testified that he never found any additional materials over the years that addressed registration requirements for strategies like the Heritage Transactions during the Relevant Time

---

[119] *Williams v. C.I.R.*, 123 T.C. 144, 153-54 (2004).

[120] *See Brinkley*, 808 F.3d at 669; *see also* 26 C.F.R. § 301.6708-1(g)(2) (a regulation interpreting penalties for failures to keep lists of clients under the current tax shelter or "listed transaction" reporting regime stating that "[t]he most important factors to establish reasonable cause are those that reflect the extent of the person's good-faith efforts to comply with [the statute].").

[121] Hr'g Trans. May 13, 2016 at 12:09:45 – 12:11:25 (Canada).

**MEMORANDUM OPINION**                                      **Page 31**

Period.[122]  In short, Canada seeks to establish reasonable cause for his failure to register the Heritage Transactions as tax shelters on the basis that (i) Ahrens told him that 26 U.S.C. § 6111 did not apply to the Heritage Transactions, and (ii) after reading the statute and the regulations interpreting it, Canada came to the same conclusion.

Canada's attempt to rely on Ahrens' advice to establish reasonable cause is problematic because of Ahrens' inherent conflict of interest regarding the Heritage Transactions.[123]  Ahrens shared fees with Heritage, and he thus had an incentive to be sure that the Heritage Transactions could be successfully marketed to as many clients as possible.[124] In total, an S-Corporation in which Ahrens and his law partner owned stock received between approximately five and six million dollars of compensation that was mostly related to the Heritage Transactions.[125] Although Canada testified that this compensation was based on a percentage of Heritage's own fees and Ahrens testified that it was based on what Heritage thought was fair, what is clear is that the amounts paid by Heritage to Ahrens were not based on the type of hourly billing practices normally employed by lawyers.[126] Ahrens is the one who initially came up with the concept of what became the Heritage Transactions and he brought that concept to Heritage's attention.[127]

---

[122] Hr'g Trans. May 13, 2016 at 12:11:00 – 12:12:40 (Canada). ("Daily I was required to read at, at Heritage certain publications…there was a publication called Daily Tax Notes. And so, it had like an index at the start of a couple of pages with synopses, and then inside it would have the full content of any [significant IRS announcements]. And I would read all of those things daily, and never saw anything that talked about registration of transactions involving short sales.").

[123] *See Neonatology Assocs.*, 115 T.C. at 98.

[124] Hr'g Trans. May 12, 2016 at 10:15:45 – 10:17:00 (Canada) (stating that in addition to a fixed fee agreed upon with the clients, that he eventually found out that Kornman was providing Ahrens with a percentage-based research and development fee "for all the work they had done in bringing this idea to us, or something in that nature.").

[125] Ahrens Depo. 47:5-51:3.

[126] Hr'g Trans. May 12, 2016 at 10:15:45 – 10:17:00 (Canada); Ahrens Depo.  48:3-15.

[127] Hr'g Trans. May 12, 2016 at 9:43:00 – 9:44:00 (Canada).

**MEMORANDUM OPINION**                                                                 **Page 32**

Ahrens was also involved in recruiting clients for Heritage, and was present at some client meetings with Canada.[128] Ahrens also drafted opinion letters regarding the Heritage Transactions for Heritage clients, a service that would not be necessary unless a client in fact decided to go through with the Heritage Transactions.[129]

Taken as a whole, the evidence indicates that Ahrens had an interest in making sure the Heritage Transactions were marketable, and—as the IRS pointed out in its closing argument—a transaction that is subject to IRS tax shelter reporting requirements is decidedly difficult to market. Ahrens prospered if Heritage prospered, and Heritage prospered by selling the Heritage Transactions to as many clients as possible. Indeed, the evidence shows that Ahrens' advice regarding the inapplicability of 26 U.S.C. § 6111 to the Heritage Transactions was given to assuage clients' fears rather than in response to any concerns on Heritage's or Canada's part.[130] As Ahrens deposition indicates:

> Q. In what regard did 6111 come up in context?
> …

---

[128] Hr'g Trans. May 12, 2016 at 10:00:50 – 10:01:30 (Canada) ("Well, [Ahrens] did bring us a couple of clients, so to that extent he, he, he was involved in marketing. But, for the most part, his firm was available, and did write, did the transactional work and wrote the opinion letters on the, probably the transactions we did, for the first, maybe, year and a half, something like that."); Ahrens Depo. 10:1-9 ("I was certainly present at meetings where [Canada] was also present at the meeting and may have made presentations to clients."); Ahrens Depo. 12:13-13:1 (Ahrens describing an instance where he recruited a client for Heritage).

[129] Hr'g Trans. May 12, 2016 at 10:00:50 – 10:01:30 (Canada).

[130] Ahrens Depo. 15:11-16:8 ("Q. … I want to go back to Mr. Canada's response to interrogatory number 10, where the statement is made, 'Likewise, Ahrens & DeAngeli told Debtor that the "ratio test" in Section 6111 was meant to cover old "oil and gas deals" and did not apply to a transaction like the one being implemented by the Heritage clients.' Specifically, did you tell Mr. Canada, make this statement to Mr. Canada at some point? A. I think I probably made that statement or something similar to that to a number of clients, not a big number, but to several clients in situations where Ralph Canada was present. And I might vary it a little bit because where it says 'oil and gas,' yeah, it could be oil and gas, but it could have been cows or boxcars, railroad boxcars, different. Apparently at way earlier points in time there were types of transactions where you could invest, say, a million dollars, and maybe you end up getting tax deductions of $2 million or some other number. And these – that's what those were designed to relate to. So oil and gas is a fine example, but it's not the only one.").

**MEMORANDUM OPINION** **Page 33**

THE WITNESS: It would typically come up in the conversation of here is a planning transaction that you've been shown, and so you need, you, Mr. Client, you need to know about some relevant code sections and whether they do apply or don't apply, just how they work…[131]

In sum, Ahrens' advice that 26 U.S.C. § 6111 did not apply to the Heritage Transactions was given to Heritage's clients in order to facilitate the Heritage Transactions, not to Canada as a part of a dispassionate assessment of whether the Heritage Transactions needed to be registered as tax shelters under 26 U.S.C. § 6111. Ahrens had an incentive to promote the Heritage Transactions both to the clients that bought his idea and to the organization—Heritage—that peddled it. Thus, Ahrens had an inherent conflict of interest when he gave the advice that 26 U.S.C. § 6111 did not apply to the Heritage Transactions, a conflict of interest of which Canada was well aware. For these reasons, Canada cannot rely on Ahrens' advice to establish his reasonable cause defense.

Although Canada is not able to reasonably rely on Ahrens' advice, he is still able to establish reasonable cause based on his own investigation of his registration obligations under 26 U.S.C. § 6111. As Canada testified, he did not take Ahrens' advice that 26 U.S.C. § 6111 did not apply to the Heritage Transactions at face value. Instead, acting as a responsible lawyer should, he read the statute himself along with the regulations interpreting it and came to the same conclusion as had Ahrens—*i.e.*, that the Heritage Transactions simply did not fit within the technical framework of 26 U.S.C. § 6111.[132]

---

[131] Ahrens Depo. 22:1-16.
[132] Hr'g Trans. May 13, 2016 at 12:09:45 – 12:11:25 (Canada).

**MEMORANDUM OPINION**                                            **Page 34**

The Court finds Canada's testimony regarding his efforts to determine his own reporting obligations under 26 U.S.C. § 6111 to be both plausible and credible. If the Heritage Transactions do indeed fit within the statutory framework of 26 U.S.C. § 6111, they fit in an odd manner. The Court can understand how an experienced lawyer such as Canada would come to the legal conclusion that the Heritage Transactions did not fit within the legal definition of "tax shelter" provided by 26 U.S.C. § 6111(c), as that is the same conclusion that this Court has come to.[133]

However, assuming Canada and this Court are wrong and the Heritage Transactions are "investments" and thus "tax shelters," reasonable cause can still be established if the mistake of law occurred in a "situation[] in which the law was unclear, the taxpayer made a reasonable good-faith effort to comply with the law, and under all the facts and circumstances it would [be] unfair to penalize the taxpayer for an honest mistake."[134] All three of these elements are satisfied here.

Even the IRS agent who testified on its behalf at the hearing on the Claim Objections admitted that the Heritage Transactions did not fit the typical mold of what would normally be considered an "investment."[135] As discussed above, this is because the plain meaning of the word "investment" does not capture the Heritage Transactions, and no authority exists that would counsel a departure from this plain meaning interpretation of the statute. To the extent that 26

---

[133] Again, the Court does not believe that Canada's legal conclusion was, in fact, mistaken. The Court agrees that the Heritage Transactions did not need to be registered as a tax shelter under 26 U.S.C. § 6111(c). However, the Court's alternative ruling on reasonable cause is premised on the assumption that the Heritage Transactions *did* need to be registered as a tax shelter under 26 U.S.C. § 6111(c).

[134] *Ochsner*, 2010 WL 2220305, at *8.

[135] Hr'g Trans. May 13, 2016 at 10:10:45 – 10:12:30 (McCaskill).

**MEMORANDUM OPINION**                                                                        **Page 35**

U.S.C. § 6111 required Canada to register the Heritage Transactions, that requirement was certainly unclear. Although the Heritage Transactions may seem to be obvious tax shelters in the colloquial sense, there was nothing in 26 U.S.C. § 6111 or any other legal authority that would have indicated to Canada that the Heritage Transactions were "tax shelters" as that term is defined in 26 U.S.C. § 6111(c).

Faced with a statute that, on its face, did not appear to apply to the Heritage Transactions, and without any contradictory authority to guide him in a different direction, this Court concludes that Canada made a reasonable, good faith effort to comply with the law by analyzing the statute on his own. It was entirely reasonable for an experienced lawyer such as Canada to rely on his own expertise in the law and his own understanding of the Heritage Transactions in order to conclude that he did not need to register the Heritage Transactions as tax shelters. There is little else that Canada could have done to assess his registration requirements under 26 U.S.C. § 6111.

Finally, under all the facts and circumstances present here, it would be unfair to penalize Canada for what appears to have been an honest mistake of law, assuming that a mistake of law was made by him here.[136] While the Court does not condone the Heritage Transactions, the IRS addressed that problem with the Heritage clients directly and, as the Court understands it, disallowed the tax benefits purportedly generated by the Heritage Transactions, which resulted in the taxes the clients owed being paid. Under the facts and circumstances of this case, it is simply unfair to impose over $40 million of penalties against Canada on the basis of a strained reading

---

[136] A mistake of law which—if it is a mistake—this Court has also made.

**MEMORANDUM OPINION**                                                                 **Page 36**

of a highly technical statute with which Canada did his best to comply.

For these reasons, the Court finds that Canada established reasonable cause under 26 U.S.C. § 6707 for any failure to register the Heritage Transactions as a tax shelter under 26 U.S.C. § 6111.

## IV.    CONCLUSION

As explained above, the Heritage Transactions were not "investments" and thus were not "tax shelters" under 26 U.S.C. § 6111(c).  As a result, Canada is not liable for penalties for his failure to register the Heritage Transactions as a tax shelter.

Alternatively, if the Heritage Transactions were "investments" and thus were "tax shelters" under 26 U.S.C. § 6111(c), Canada carried his burden of proof and established reasonable cause under 26 U.S.C. § 6707 for his failure to register the Heritage Transactions as a tax shelter under 26 U.S.C. § 6111.  As a result, Canada is not liable to the IRS for tax shelter organizer penalties.

Thus, to this extent, the Claim Objections are sustained and the associated penalties are disallowed.

The parties are directed to confer with each other and submit an Order consistent with this Memorandum Opinion to the Court within 10 days of the entry of this Memorandum Opinion on the Court's docket.  If the parties cannot agree on the form of an appropriate Order, each party shall submit its proposed Order to the Court within 14 days of the entry of this Memorandum Opinion on the Court's docket, along with a letter explaining why its proposed form of Order is more appropriate than the other party's proposed form of Order.

### ### End of Memorandum Opinion ###

**MEMORANDUM OPINION**                                                    **Page 37**